McCONNELL, J.,
concurring in part and dissenting from Part II.
I agree with much of the majority’s reasoning. I agree that the sentence must be remanded to allow the district judge to exercise the full range of his discretion, including consideration of the relative amount of force used in commission of the offense. I agree that allowing the prosecution to cross-examine Mr. Cerno about the embarrassing “exposure incident”[1] was “undoubtedly prejudicial.” Maj. Op. 935-36. The district judge thought so too, which is why he excluded reference to the incident on a pre-trial motion in limine and on three subsequent occasions during trial. The judge never retracted or wavered in his prejudice finding, though he later changed his view of relevance in light of developments at trial. I also agree with the majority that the relevance (if any) of the exposure incident was less than the district court found: “we cannot go so far as to agree that it had ‘significant’ impeachment value or directly ‘fl[ew] in the face of Cerno’s previous statements, as the district court concluded.” Id. at 934-35 (quoting from the district court).
I would go a step further. Based on a full reading of the trial transcript, and giving the prosecution and the district court every benefit of the doubt, I am forced to the conclusion that this evidence was not relevant at all. It was solely prejudicial, and in light of the weakness of the prosecution’s case, it very likely affected the outcome. I therefore do not reach the third step in the majority’s analysis of the evidentiary issue, which is whether the district court abused its discretion under Rule 403 in balancing the probative value of the testimony against its undoubted prejudicial effect. Because the testimony had no probative value, there was nothing to balance.
The majority reaches its conclusion because of its commendable disinclination to second-guess the able trial judge on a matter particularly within his discretion, namely Rule 403 balancing. Maj. Op. 935-36. Given the highly contextual character of the exercise of weighing probative value against prejudice, appellate courts are properly reluctant to find an abuse of discretion at the balancing stage. See United States v. Tan, 254 F.3d 1204, 1211 (10th Cir.2001) (emphasizing the district court’s “considerable discretion” with respect to Rule 403 balancing). I depart from the *941 majority because I do not think this case gets to the point of balancing.
I. The Trial
This case was a classic example of he said-she said. The sole evidence against Mr. Cerno was testimony from the alleged victim, his 17-year old niece. She claimed that on at least three occasions over about one and a half months (at one point she claimed around 30 such incidents), when no one else was at home, Mr. Cerno penetrated her orally and digitally, on one occasion required her to touch his penis, and on one occasion bit her breast, leaving a scar. She admitted he did not hit or physically threaten her, but testified that she resisted his advances and that he forced the contact.
Mr. Cerno took the stand and denied that he had ever engaged in any type of sexual contact with his niece, ever touched her in any inappropriate way, or ever used or threatened force against her. Tr. 341. He openly admitted to being a drunk, and testified that he spent most of his evenings outside, usually sitting in his mother’s truck drinking beer and listening to the radio, sometimes in the corral or garden. He stated that after drinking he would sometimes “pass out,” but that he did not have “black-outs,” the distinction being that in the case of a black-out, he “can’t remember anything” but when he merely “pass[ed] out” he would wake up the next day and “I would remember where I was at and what I had done.” Tr. 323-24. When his mother was away from the house, he sometimes “sneaked” in and watched television while drinking, which his mother had forbidden in the house. Tr. 338. He testified that he had no opportunity to commit the charged acts because he was almost never alone in the house with his niece. His mother was usually at home, and when she went elsewhere, he generally drove her.
At trial, the defense attempted to show that the alleged victim had powerful motives to fabricate the charge: Until the age of 14 she lived with her mother in a permissive environment in Los Lunas, New Mexico. After her mother’s death and an unsatisfactory placement with her father and stepmother, she was sent to live with her grandmother in a remote section of the Acoma Pueblo reservation, far from her friends and subject to strict behavioral limitations, which she resented. As a result of her accusation that Mr. Cerno had abused her, she was sent to live with more congenial relatives closer to town. The theory of the defense was that she made up the abuse charges to accomplish this desired change.
There were other witnesses, but they provided no support for the prosecution’s case. The victim’s father and stepmother never saw any signs of abuse. There was no medical evidence. An FBI agent testified to her investigation into the matter, which, to put it charitably, was neither prompt nor thorough and uncovered nothing probative — with the possible exception of a photograph of the alleged victim’s breast taken about a year after she claimed Mr. Cerno had bit it. As was brought out in cross-examination, the government did not conduct any forensic investigation to compare the bite marks to Mr. Cerno’s teeth. Since Mr. Cerno is missing his four front teeth, this physical evidence was dubious proof of his guilt.
The prosecution showed great persistence in attempting to bring before the jury evidence of the unsavory exposure incident, putting forth a variety of theories of relevance, most of which the district court rejected. Before trial, in response to the defendant’s motion in limine, the prosecutor argued that the incident was rele *942 vant because it explained why the alleged victim thought Mr. Cerno was “disgusting,” and thus supported her claim that the incidents were nonconsensual. The district court concluded that the incident had limited probative value and granted the motion in limine to exclude it. During trial, after the defense asked the alleged victim on cross-examination whether she had been scared that Mr. Cerno would hurt her, the prosecutor asked for reconsideration on the ground that testimony about the incident would show that the alleged victim had seen her uncle passed out in front of a pornographic video, and that “[p]ornography is a form of violence.” Tr. 242. The district court declined to reconsider.
Again, after Mr. Cerno’s direct testimony, the prosecutor renewed the motion, this time arguing that the exposure incident somehow showed that the defendant’s claim that the alleged victim had fabricated the case against him was “artificial.” Tr. 347. The district judge again denied the motion, stating that “there hasn’t been established a nexus between the incident and the defendant’s conduct, so far as I am aware.” Id. at 350.
Before cross-examination could begin, however, the judge called the lawyers back to the bench to give the prosecutor another opportunity to explain how the exposure incident was related to the case. There ensued a lengthy discussion. Although the district court ultimately denied the prosecution’s motion to allow the testimony, the discussion casts light on the reasons for its eventual admission. At first, the prosecutor argued again that the incident was relevant to showing lack of consent — which is odd, since by then it was clear that the defendant’s theory was not that the encounters were consensual but that they did not occur.
At that point, the judge for the first time introduced the possibility that the evidence might be relevant for impeachment purposes:
THE COURT: Well, the reason I asked you to come back up here was that it occurred to me that he has professed being cognizant of everything, although he would pass out. And I doubt that. And this might be a way of contradicting or impeaching a witness, but I still have the concern that the impeachment is nexus [sic], is very limited or very, let’s say, attenuated.
Tr. 352. The prosecutor, Mr. Spiers, leapt on that suggestion. Misstating the defendant’s testimony,[2] the prosecutor argued: “the defendant has presented himself on direct as being, for lack of a better description, as being just a benign drunk ... [a]nd that’s not accurate.” Tr. 352. The court asked:
THE COURT: What are you going to do with this?
MR. SPIERS: I want to ask him if there was an instance when he was passed out drunk, if there was something else going on; and in fact, he wasn’t just passing out and drinking, and that there was something else, something a little bit more graphic and a little bit more disturbing.
Tr. 354. This suggests a possible reason for the prosecutor’s persistence in trying to get this evidence in: that a jury might infer that a man who engages in such “graphic” and “disturbing” conduct as passing out in front of a pornographic movie with his penis exposed is also someone who might sexually abuse his teenaged niece.
Defense counsel repeatedly challenged the relevance of the incident, and argued *943 that even if it was relevant, any probative value was greatly outweighed by the prejudice. At the end of all this discussion, the court stated, without further explanation: “I’m not going to change my ruling. Please proceed.” Tr. 357.
That was not the end of the matter. During the prosecutor’s cross-examination of Mr. Cerno, the following colloquy took place:
Q. Okay. Now, about drinking, you would agree it’s kind of a problem in your life, isn’t it?
A: Yes.
Q. And when you’re drinking heavily, that impairs your judgment, doesn’t it? A. Six to eight cans all day long isn’t going to impair my judgment to where I don’t know what I’m doing.
Q. It never impaired your judgment to the point that you don’t know what you are doing?
A. Yes.
Q. Is that your answer?
A. Because that’s almost drinking a beer every hour.
Tr. 362-63. At this point, the prosecutor asked to approach the bench again, to reopen the issue of introducing the exposure incident. After the court agreed to hear his argument, however, the prosecutor asked to reserve the issue until he finished cross-examination, to which the judge also agreed. After he completed his cross-examination, the prosecutor reminded the court of his request to “approach the bench one last time.” Tr. 376. At this point, with no further prompting or argument, the judge announced:
I’ve concluded that there is significant value in impeaching — probative value in impeaching the defendant by the incident that has been described in the motion in limine, excluding the discovery of videotapes in the closet, just the incident that she comes home and sees him passed out and the situation that you have described. And it’s impeachment only.

Id.

Defense counsel inquired “what exactly [the defendant] said that opens the door to that.” The judge answered: “Well, he said he was completely in control of his senses, he didn’t lose his judgment. That much is clear, that he lost it then.” Id. The prosecutor chimed in that “[h]e also said that he has never drunk to the point where he passed out and didn’t remember what he was doing,” to which the judge responded: “Yes. That’s pretty clear, in that he denies that his judgment was impaired, and I submit that that occasion flies in the face of his denial of losing judgment.” Id. at 377. Defense counsel reminded the judge of the distinction Mr. Cerno had drawn between “passing out” and “blacking out,” to which the judge responded: “You know, you can define ‘passing out’ any way you want to. If he’s unconscious, drunk, he is blacked out, passed out, whatever.” Id.
The prosecutor thus was free to ask Mr. Cerno about the exposure incident:
Q: Okay. Do you recall a point in time between the time frame of July and August of 2004 and the 31st day of April of 2005, when you were at your mother’s house and you had been drinking, and you passed out, with your penis exposed, watching a pornographic movie?
A: Yes.
Q: You would agree with me, wouldn’t you, that at that point your judgment had become very much and terribly impaired?
A: No.
Q: That was not bad judgment?
*944 A: No one was at home, so I watched it and passed out.
Q: With your penis exposed?
A: Yes. I didn’t expect anybody home. Everybody was not supposed to come home that night.
Q: You’ve learned that they did in fact come home?
A: Yes.
Q: And you’ve learned that [the victim] and two other people came back from a wake and saw you passed ■out, with your penis exposed, watching a pornographic movie?
A: Yes.
Q: And you would not agree with me? You wouldn’t agree that your judgment was impaired?
A: No, because I was watching it. I remember watching it.
Tr. 381. The prosecutor later devoted about one page of his just-over-seven-page closing argument to the exposure incident.
In a strange split verdict, the jury convicted Mr. Cerno of the more serious charges of aggravated sexual abuse while acquitting him of the less serious charges of aggravated sexual contact. The defense moved for a judgment of acquittal or a new trial, partly on account of the admission of the prejudicial evidence. The district court denied the motion and entered a written order explaining the rationale for admission of the evidence:
The testimony at issue impeaches Defendant’s claims that drinking did not impair his judgment and that he knew what he was doing when he drank. The testimony also impeaches Defendant’s statements that he would sit down and not do anything when drinking. The challenged testimony indicates that Defendant, when drinking, did engage in activities of a sexual nature, contrary to what his testimony represented. The Court therefore concluded that the Rule 403 balancing weighed in favor of admitting the evidence because the exposure testimony had significant probative impeachment value that was not outweighed by its potential for unfair prejudice.
Dist. Ct. Dkt. No. 60, Mem. Op. & Order, at 10.
II. Analysis
Evidence of the exposure incident was admitted solely for purposes of impeachment, that is, to show that Mr. Cerno’s testimony to the jury was not truthful. Black’s Law Dictionary (8th ed.2004) defines impeachment as “[t]he act of discrediting a witness, as by catching the witness in a lie.... ” The Rules of Evidence state that, to be admissible for impeachment, evidence must be “probative of truthfulness or untruthfulness,” and must “concern! ] the [defendant’s] character for truthfulness or untruthfulness.” Fed. R.Evid. 608(b). If there is evidence that “specifically] contradicts]” a witness’s testimony, impeachment evidence is admissible to demonstrate that the witness lacks credibility and has a propensity for lying. United States v. Crockett, 435 F.3d 1305, 1313 (10th Cir.2006).
The transcript does not reveal any statements by Mr. Cerno that were revealed as untruthful by admission of evidence of the exposure incident. The prosecutor argued repeatedly that the episode contradicted Mr. Cerno’s claim that he was a “benign drunk.” Defendant never described himself in this way. He testified that his drinking was a factor in breaking up his marriage and had impaired his health. He testified that he would pass out from drinking (but not to the point of failing to remember what he had been doing) and testified to his typical conduct when at home in the evening, which consisted of *945 drinking by himself outside or occasionally sneaking into the house to drink and watch television when his mother was not home. He did not state that he never watched pornography; he was never asked. And he did not state that he never masturbated; again, he was never asked. It is hard to see how the exposure incident contradicted anything to which he testified.
When the district court finally decided to admit the exposure matter, the judge expressed his belief that the incident contradicted Mr. Cerno’s testimony that “he was completely in control of his senses, he didn’t lose his judgment. That much is clear, that he lost it then.” Tr. 376. This statement suggests two slightly different versions of the court’s rationale for admitting the evidence: that the exposure matter indicated Mr. Cerno “los[t] his judgment” when drinking, and that it demonstrated that Mr. Cerno was not “completely in control of his senses.” These two concerns are further reflected in the court’s colloquy with the prosecutor and in its written ruling. After the court expressed its reasons for admitting the evidence, the prosecutor jumped in to add that Mr. Cerno “also said that he has never drunk to the point where he passed out and didn’t remember what he was doing,” to which the judge responded: ‘Yes. That’s pretty clear, in that he denies that his judgment was impaired, and I submit that that occasion flies in the face of his denial of losing judgment.” Tr. 377. In the court’s written ruling, the judge stated first that “[t]he testimony at issue impeaches Defendant’s claims that drinking did not impair his judgment and that he knew what he was doing when he drank.” But the record does not bear out the court’s concerns.
It is important to stress that the defendant’s references to impairment of his judgment all were in connection with his memory. On cross-examination Mr. Cerno stated: “[s]ix to eight cans [of beer] all day long isn’t going to impair my judgment to where I don’t know what I’m doing.” Id. at 362 (emphasis added). The prosecutor repeated Mr. Cerno’s full statement back to him, and Mr. Cerno confirmed that this was correct. Id. Mr. Cerno never testified that he exercised perfect, or even good, judgment in other respects.
Mr. Cerno’s belief that the references to impaired judgment related to memory is logical, and is further substantiated by the record. This case was essentially a contest over which witness the jury would believe. It is evident that Mr. Cerno understood all questions along these lines as essentially an attack on whether he had an accurate memory of what had taken place and thus whether the jury could credit his account. Even after the prosecutor asked Mr. Cerno about the exposure incident, the following exchange occurred:
Q. And you’ve learned that [the alleged victim] and two other people came back from the wake and saw you passed out, with your penis exposed, watching a pornographic movie.
A. Yes.
Q. And you would not agree with me? You wouldn’t agree that your judgment was impaired?
A. No, because I was watching it. I remember watching it.
Tr. 381. It is thus perfectly clear that Mr. Cerno’s testimony that his judgment was not impaired when he was drinking, even to the point of passing out, was nothing more than a statement that he remembered what he was doing. That was in no way impeached by evidence of the incident, which he remembered.
As to the second version of the court’s rationale, Mr. Cerno never asserted he was “completely in control of his senses.” He openly admitted that he would drink to *946 the point of passing out. Tr. 324, 342^43, 345. That he passed out on the night of the exposure incident is entirely consistent with his testimony, and the remainder of the incident is irrelevant to it. In his direct testimony, Mr. Cerno carefully distinguished between “passing out” (when he remembered the next day what he had been doing) and “blacking out” (when he had no such memory). He testified that he “passed out” but did not have “black outs.” The district judge, however, questioned whether there is truly any distinction between passing out and blacking out. See Tr. 377 (“You know, you can define ‘passing out’ any way you want to. If he’s unconscious, drunk, he is blacked out, passed out, whatever.”). Assuming that there was not, the district court judge concluded that the exposure incident contradicted Mr. Cerno’s testimony. But the question is not whether Mr. Cerno was using language properly; it is whether he was lying and whether the exposure incident proved he was lying. Since he remembered what he was doing the night of the exposure incident, see Tr. 381, 383-84, despite having passed out, the district court was wrong to conclude that the incident showed he was lying.
The next rationale in the judge’s written ruling was that “[t]he testimony also impeaches Defendant’s statements that he would sit down and not do anything when drinking. The challenged testimony indicates that Defendant, when drinking, did engage in activities of a sexual nature, contrary to what his testimony represented.” The majority does not rely on this portion of the written order, concluding that the first rationale was sufficient. Maj. Op. 932-33. This rationale is equally unsupported on the record. The judge’s idea that the defendant said he “would sit down and not do anything while drinking,” derives from his testimony that
Well, if I passed out, well, I passed out. If I was sitting in the truck, I would ask my mom: I’m going to get the keys and sit in the truck. And she knew I wasn’t going to drive anywhere. So I would just sit there, and the alcohol would just make me relax and just want to sit there and not do anything.
Tr. 345. He did not testify that he never did anything when drinking. The quoted testimony is merely a description of what he would want to do “if he was sitting in the truck.” He testified on the previous page of the transcript that sometimes he would “be out with my friends or my relatives back in McCarty, where I was drinking.” Id. at 344. He was not asked, and he did not volunteer, what he did with them on those occasions. More importantly, he had already testified that sometimes, when his mother was away from the house, he “sneaked” in and watched television while drinking. Id. at 338. That is precisely what happened on the night of the incident. Mr. Cerno was not asked what he watched, and he did not volunteer it; he was not asked whether he ever did anything of a sexual nature when drinking, and he did not volunteer it. That he watched pornography and apparently did something of a sexual nature that evening is not impeachment when he never was asked, and never denied, doing things of that nature. It is an enormous stretch to say that a defendant may be “impeached” by evidence of a highly prejudicial character in order to show that he was lying when he testified that during the occasions when he drank in the truck, he would just sit there and relax and not want to do anything. His testimony to that effect could be entirely truthful, even if on other occasions he did other things of a less innocuous nature while drinking.
In short, the reasons given for admitting the evidence as impeachment were based on an inaccurate recollection of Mr. Cer- *947 no’s very careful, and precise, testimony. Mr. Cerno never testified that he did not pass out. He never called himself a “benign drunk” or even claimed that he exercised “good judgment”; nor did he say that he always “did nothing” while drinking. Because the exposure incident did not actually contradict any of Mr. Cerno’s testimony, it had no probative impeachment value.
I therefore respectfully dissent from Part II of the majority’s opinion.

. The incident is described at Maj. Op. 928. The delicacy with which all participants in this case speak of the incident highlights the prejudicial effect it must have had on the jury.

. The reasons this statement were misleading are outlined at page 944 below.